No. 25-1068

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

NAVIGATORS INS. CO., ET AL.,

*Plaintiffs – Appellants,*

v.

UNDER ARMOUR, INC.

*Defendant – Appellee.*

On Appeal from the United States District Court
for the District of Maryland
No. 1:22-cv-02481-RDB
Hon. Richard D. Bennett

## PUBLIC OPENING BRIEF OF APPELLANTS (REDACTED)

Richard A. Simpson
Margaret T. Karchmer
Anna J. Schaffner
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
*Counsel for Plaintiff-Appellant*
*Continental Casualty Company*

*Additional counsel for Plaintiffs-*
*Appellants listed on next page*

Michael P. O'Day
Alexa Pauline Ain
DLA PIPER LLP (US)
650 S. Exeter Street
Suite 1100
Baltimore, MD 21202
(410) 580-3000
*Counsel for Plaintiff-Appellant*
*National Union Fire Insurance*
*Company of Pittsburgh, PA*

Gabriela Richeimer
WERNER AHARI MANGEL LLP
2112 Pennsylvania Avenue NW
Suite 200
Washington, DC 20037
(202) 599-1092
*Counsel for Plaintiff-Appellant XL*
*Specialty Insurance Company*

John R. Solter, Jr.
AZRAEL, FRANZ, SCHWAB,
LIPOWITZ & SOLTER, LLC
101 East Chesapeake Avenue
Fifth Floor
Baltimore, MD 21286
(410) 821-6800

Paul T. Curley
Briana Semenza
KAUFMAN BORGEEST & RYAN
LLP
200 Summit Lake Drive
Valhalla, NY 10595
(914) 449-1019
*Counsel for Plaintiff-Appellant Swiss*
*Re Corporate Solutions America*
*Insurance Corporation*

John J. Murphy, Esq.
WALKER, MURPHY & NELSON,
LLP
9210 Corporate Boulevard
Suite 320
Rockville, MD 20850
(301) 519-9150
*Counsel for Plaintiff-Appellant*
*Navigators Insurance Company*

Leslie S. Ahari
WERNER AHARI MANGEL LLP
2112 Pennsylvania Avenue NW
Suite 200
Washington, DC 20037
(202) 599-1013
*Counsel for Plaintiff-Appellant QBE*
*Insurance Company*

John J. Murphy, Esq.
WALKER, MURPHY & NELSON,
LLP
9210 Corporate Boulevard, Suite 320
Rockville, MD 20850
(301) 519-9150

Geoffrey W. Heineman, Esq.
John J. Iacobucci Jr., Esq.
ROPERS MAJESKI PC
800 Third Avenue, 29th Floor
New York, New York 10022
(212) 668-5927
*Counsel for Plaintiff-Appellant*
*Argonaut Insurance Company*

Travis Wall
Gordon Smith
KENNEDYS CMK LLP
455 Market Street, Suite 1900
San Francisco, CA 94105
(415) 323-4487
*Counsel for Plaintiff-Appellant Allied*
*World National Assurance Company*

John R. Solter, Jr.
AZRAEL, FRANZ, SCHWAB,
LIPOWITZ & SOLTER, LLC
101 East Chesapeake Avenue
Fifth Floor
Baltimore, MD 21286
(410) 821-6800

Darius N. Kandawalla
Jordan W. Ziolkowski
BAILEY CAVALIERI LLC
10 W. Broad Street, Ste. 2100
Columbus, OH 43215
(614) 229-3257
*Counsel for Plaintiff-Appellant*
*Freedom Specialty Insurance Company*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1068__       Caption: __Navigators Insurance Company, et al. v. Under Armour, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Argonaut Insurance Company__
(name of party/amicus)

who is _____ an Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                ☑YES ☐NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      The parent of Argonaut Insurance Company is Argo Group US, Inc., which is an indirect subsidiary of Brookfield Wealth Solutions Ltd., a publicly traded corporation.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                ☑YES ☐NO
      If yes, identify all such owners:
      Please see the preceding section.

12/01/2019 SCC                          - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /S/ John J. Murphy (#14407)    Date:    2/4/25

Counsel for: Argonaut Insurance Company

- 2 -

**Print to PDF for Filing**

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1068          Caption: Navigators Insurance Company, et al. v. Under Armour, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Navigators Insurance Company
(name of party/amicus)

who is _____ an Appellant _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☑YES ☐NO
   If yes, identify all parent corporations, including all generations of parent corporations:

   Navigators Insurance Company is wholly owned by The Navigators Group, Inc. The Navigators Group, Inc. is a wholly-owned subsidiary of The Hartford Financial Services Group, Inc., which is a publicly traded corporation with no parent corporations.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☑YES ☐NO
   If yes, identify all such owners:

   Please see the preceding section.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: __John J. Murphy #14407__    Date: _____2/5/25_____

Counsel for: __Navigators Insurance Company__

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1068__          Caption: __Navigators Insurance Company, et al v. Under Armour, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Continental Casualty Company__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                        ☑YES ☐NO
        If yes, identify all parent corporations, including all generations of parent corporations:

        Continental Casualty Company is wholly owned by The Continental Corporation, which is not publicly traded.  The Continental Corporation is wholly owned by CNA Financial Corporation, a publicly held company.  Loews Corporation owns the majority of the common stock of CNA Financial Corporation and is publicly traded.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☑YES ☐NO
        If yes, identify all such owners:

        Continental Casualty Company is wholly owned by The Continental Corporation, which is not publicly traded.  The Continental Corporation is wholly owned by CNA Financial Corporation, a publicly held company.  Loews Corporation owns the majority of the common stock of CNA Financial Corporation and is publicly traded.  No other corporation owns 10% or more of the common stock of CNA Financial Corporation.


12/01/2019 SCC                                    - 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Anna J. Schaffner          Date:      2/5/2025

Counsel for: Continental Casualty Company

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1068__     Caption: __NAVIGATORS INSURANCE COMPANY, et al. v UNDER ARMOUR, INC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__XL SPECIALTY INSURANCE COMPANY__
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?   ☑ YES ☐ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

        XL Specialty Insurance Company is a direct subsidiary of Greenwich Insurance Company, Inc. and is an indirect subsidiary of X.L. America, Inc., XL Financial Holdings (Ireland) Limited, XL Bermuda Ltd, XL Group Ltd, and AXA SA. The ultimate parent of XL Specialty is AXA SA, a company domiciled in France.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
        If yes, identify all such owners:

12/01/2019 SCC                              - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: _____     Date: _____2/5/2025_____

Counsel for: _Appellant, XL SPECIALTY INS CO_

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _25-1068_          Caption: _Navigators Ins. Co., et al. v. Under Armour, Inc._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Swiss Re Corporate Solutions America Insurance Corporation_
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      See Attachment A

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☑ YES ☐ NO
      If yes, identify all such owners:
      Yes.  Swiss Re Ltd, a publicly traded company listed in accordance with the International Reporting Standard on the SIX Swiss Exchange.  See Attachment A.

12/01/2019 SCC                          - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature:  /s/ John R. Solter Jr.                    Date:  February 5, 2025

Counsel for:  Swiss Re Corporate Solutions Americ

- 2 -

Print to PDF for Filing

ATTACHMENT A

- Swiss Re Corporate Solutions America Insurance Corporation (formerly North American Specialty Insurance Company) is wholly owned by SR Corporate Solutions America Holding Corporation.

- SR Corporate Solutions America Holding Corporation is wholly owned by Swiss Re Corporate Solutions Holding Company Ltd.

- Swiss Re Corporate Solutions Holding Company Ltd is wholly owned by Swiss Reinsurance Company Ltd.

- Swiss Reinsurance Company Ltd is wholly owned by Swiss Re Ltd, a publicly traded company listed in accordance with the International Reporting Standard on the SIX Swiss Exchange.

- No publicly traded company owns 10% or more of the stock of Swiss Re Ltd.

10984993

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1068__        Caption: __Navigators Ins. Co., et al. v. Under Armour, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__QBE Insurance Corporation__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☑ YES ☐ NO

2.      Does party/amicus have any parent corporations?                              ☑ YES ☐ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

        QBE Insurance Corporation is 100% owned by QBE Reinsurance Corporation, which is 100% owned by QBE Holdings, Inc.; QBE Holdings, Inc. is ultimately but indirectly owned by QBE Insurance Group Limited, a publicly traded corporation on the Australian Stock Exchange.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                                   ☑ YES ☐ NO
        If yes, identify all such owners:

        QBE Insurance Corporation is 100% owned by QBE Reinsurance Corporation, which is 100% owned by QBE Holdings, Inc.; QBE Holdings, Inc. is ultimately but indirectly owned by QBE Insurance Group Limited, a publicly traded corporation on the Australian Stock Exchange.

12/01/2019 SCC                                - 1 -

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

> Other than the entities mentioned above and entities identified in the corporate disclosure statements filed by other parties, QBE Insurance Corporation is not aware of any other entities that are not parties to this litigation with a financial interest in this litigation.

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____    Date: _____02/06/2025_____

Counsel for: __QBE Insurance Corporation_____

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1068__     Caption: __Navigators Ins. Co., et al. v. Under Armour, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Freedom Specialty Insurance Company__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?    ☑ YES ☐ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    Nationwide Mutual Insurance Company

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?          ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)     ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?          ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?          ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _Jordan W. Ziolkowski_          Date: ___February 6, 2025___

Counsel for: _Freedom Specialty Insurance Co.___

- 2 -

**Print to PDF for Filing**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1068__     Caption: __Navigators Insurance Company, et al. v. Under Armour, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__National Union Fire Insurance Company of Pittsburgh, PA__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?   ☑ YES ☐ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

     National Union is a direct, wholly-owned (100%) subsidiary of AIG Property Casualty U.S. Inc., which is a wholly-owned (100%) subsidiary of AIG Property Casualty Inc., which is a wholly-owned (100%) subsidiary of American International Group, Inc., which is a publicly-held corporation.

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
     If yes, identify all such owners:

12/01/2019 SCC                                    - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?  ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: __Michael P. O'Day__     Date: __2/6/2025__

Counsel for: __National Union Fire Insurance Co.__

- 2 -

[ Print to PDF for Filing ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __25-1068__          Caption:  Navigators Insurance Company, et al. v. Under Armour, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

__ALLIED WORLD NATIONAL ASSURANCE COMPANY__
(name of party/amicus)

_____

 who is _____an Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.   Does party/amicus have any parent corporations?                      ☑ YES ☐ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

     The party is wholly owned by Allied World Assurance Holdings (U.S.), Inc., which is wholly owned by Allied World Assurance Holdings (Ireland) Ltd., which is wholly owned by Allied World Assurance Company Holdings I, Ltd, which is wholly owned by Allied World Assurance Company Holdings Ltd. The ultimate parent is Fairfax Financial Holdings Ltd.

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                     ☐ YES ☑ NO
     If yes, identify all such owners:


12/01/2019 SCC                          - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____     Date: ___February 6, 2025___

Counsel for: _ALLIED WORLD NATIONAL ASSUR_ANCE COMPANY

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

JURISDICTIONAL STATEMENT ............................................................................1

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF THE ISSUES..................................................................................3

STATEMENT OF THE CASE .....................................................................................5

I.   The Underlying Matters ...................................................................................5

    A.   The Securities Class Action.....................................................................5

    B.   The Derivative Matters..........................................................................13

    C.   The Government Investigations..............................................................15

    D.   Under Armour's Request for Coverage...................................................18

II.  The District Court's Decision.........................................................................23

SUMMARY OF THE ARGUMENT .........................................................................24

STANDARD OF REVIEW .......................................................................................28

ARGUMENT .............................................................................................................29

I.   None of the Underlying Matters is a Claim first made during the 17-18 Policy
Period. ...........................................................................................................29

  A.  The Securities Class Action, in its entirety, is a "Claim" first made before
  the 17-18 Policy Period..........................................................................29

  B.  The Underlying Matters all allege a single fraudulent scheme and are,
  therefore, deemed a single Claim first made before the 17-18 Policy Period......33

    1.   The District Court committed numerous threshold errors in interpreting
    the Single Claims Provision. ................................................................33

    2.   The Underlying Matters fall within the Single Claims Provision because
    they all arise out of the same scheme to misrepresent Under Armour's financial
    condition and growth prospects. ...........................................................35

    3.   The conclusion that the Underlying Matters fall within the Single Claims
    Provision follows *a fortiori* from a substantial body of case law in this Court
    and nationwide.....................................................................................45

II.  The Specific Matter Exclusion and Prior Notice Exclusion each separately and independently bar coverage. ..................................................................53

III. The 19-21 Policies' Specific Investigation Exclusion cannot amend the 17-18 Policies. ..................................................................................................55

CONCLUSION ......................................................................................56

STATEMENT REGARDING ORAL ARGUMENT ...........................................59

CERTIFICATE OF COMPLIANCE...................................................................60

CERTIFICATE OF SERVICE ........................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACE American Insurance Co. v. Ascend One Corp.*,
570 F. Supp. 2d 789 (D. Md. 2008) .................................................................52

*ADI Worldlink, LLC v. RSUI Indemnity Co.*,
No. 4:16-cv-665-ALM-CAN, 2017 WL 6403047 (E.D. Tex. Aug.
16, 2017) ...........................................................................................................35

*In re Alexion Pharmaceuticals, Inc. Insurance Appeals*,
Case Nos. 154, 2024 and 157, 2024, 2025 WL 383805 (Del. Feb.
4, 2025) ........................................................................................................37, 38

*American Casualty Co. of Reading, Pa. v. Belcher*,
709 F. App'x 606 (11th Cir. 2017) ..............................................................49, 50

*American Southwest Mortgage Corp. v. Continental Casualty Co.*,
84 F.4th 910 (10th Cir. 2023) ...........................................................................48

*Bryan Bros. Inc. v. Continental Casualty Co.*,
704 F. Supp. 2d 537 (E.D. Va. 2010), *aff'd* 660 F.3d 827 (4th Cir.
2011) ............................................................................................................46, 47

*CAMICO Mutual Insurance Co. v. Jackson CPA Firm*,
No. 2:15-cv-1823-PMD, 2016 WL 7403959 (D.S.C. Dec. 22,
2016) ...........................................................................................................47, 48

*CapWealth Advisors, LLC v. Twin City Fire Insurance Co.*,
No. 23-5359, 2024 WL 1134647 (6th Cir. Mar. 15, 2024) ..............................32

*Catalina Enterprises, Inc. Pension Trust v. Hartford Fire Insurance
Co.*,
67 F.3d 63 (4th Cir. 1995) ................................................................................28

*Community Foundation for Jewish Education v. Federal Insurance
Co.*,
16 F. App'x 462 (7th Cir. 2001) .......................................................................32

*Continental Casualty Co. v. AWP U.S., Inc.*,
No. 3:19cv661, 2021 U.S. Dist. LEXIS 64136 (E.D. Va. Mar. 31,
2021) ..................................................................................................34

*Continental Casualty Co. v. Wendt*,
205 F.3d 1258 (11th Cir. 2000) ..........................................................50

*Continental Casualty Co. v. Jones*,
No. 3:09-cv-1004-JFA, 2011 WL 3880963 (D.S.C. Sept. 2, 2011),
*amended on other grounds on reconsideration as stated in* 2012
WL 530002 (D.S.C. Feb. 17, 2012)......................................................47

*Deutsche Bank National Trust Co. Trustee for IndyMac INDX
Mortgage Loan Trust 2006-AR12 v. Fegely*,
767 F. App'x. 582 (4th Cir. 2019) .......................................................28

*Federal Insurance Co. v. Raytheon Co.*,
426 F.3d 491 (1st Cir. 2005)................................................................32

*First Solar, Inc. v. National Union Fire Insurance Co. of Pittsburgh,
Pa.*,
274 A.3d 1006 (Del. 2022) ............................................................50, 51

*Gregory v. Navigators Insurance Co.*,
No. 23-17-cv, 2023 WL 8538173 (2d Cir. Dec. 11, 2023) .................32

*Hanover Insurance Co. v. R.W. Dunteman Co.*,
446 F. Supp. 3d 336 (N.D. Ill. 2020), *aff'd*, 51 F.4th 779 (7th Cir.
2022) ..............................................................................................30, 31

*Hanover Insurance Co. v. R.W. Dunteman Co.*,
51 F.4th 779 (7th Cir. 2022) ..........................................................31, 32

*Highwoods Properties v. Executive Risk Indemnity, Inc.*,
407 F.3d 917 (8th Cir. 2005) ..............................................................48

*Horn v. Liberty Insurance Underwriters, Inc.*,
998 F.3d 1289 (11th Cir. 2021) ..........................................................31

*Jerry's Enterprises, Inc. v. U.S. Specialty Insurance Co.*,
845 F.3d 883 (8th Cir. 2017) ..............................................................32

*Kilcher v. Continental Casualty Co.*,
   747 F.3d 983 (8th Cir. 2014) ........................................................50

*McWhorter v. Bankers Standard Insurance Co.*,
   611 F. Supp. 3d 3 (D. Md. 2020).................................................34

*Mitchell v. AARP Life Insurance Program, N.Y. Life Insurance Co.*,
   779 A.2d 1061 (Md. Ct. Spec. App. 2001)...............................29

*Market Street Bancshares, Inc. v. Federal Insurance Co.*,
   962 F.3d 947 (7th Cir. 2020) ......................................................32

*Morden v. XL Specialty Insurance*,
   903 F.3d 1145 (10th Cir. 2018) .................................................49

*National Union Fire Insurance Co. of Pittsburgh, Pa. v. Willis*,
   296 F.3d 336 (5th Cir. 2002) ......................................................31

*Perdue Farms, Inc. v. National Union Fire Insurance Co. of
   Pittsburgh, Pa.*,
   517 F. Supp. 3d 458 (D. Md. 2021)...........................................52

*RLI Insurance Co. v. OutsideIn Architecture, LLC*,
   692 F. Supp. 3d 1077 (M.D. Fla. 2023).....................................35

*Stewart Engineering, Inc. v. Continental Casualty Co.*,
   751 F. App'x 392 (4th Cir. 2018).................................................46

*Tarter v. Navigators Insurance Co.*,
   No. 21-5129, 2021 WL 4950375 (6th Cir. Oct. 25, 2021) .................32

*Taylor v. Security Nattional Insurance Co.*,
   No. 6:17-cv-2379-DCC, 2018 WL 1210563 (D.S.C. Mar. 8, 2018).................35

*UBS Financial Services, Inc. of P.R. v. XL Specialty Insurance Co.*,
   929 F.3d 11 (1st Cir. 2019)..........................................................32

*Uni-Pixel, Inc. v. XL Specialty Insurance Co.*,
   No. 14-18-00828-CV, 2020 WL 1528098 (Tex. App. Mar. 31,
   2020) ...........................................................................................51

*W.C. & A.N. Miller Development Co. v. Continental Casualty Co.*,
   2014 WL 5812316 (D. Md. Nov. 7, 2014) .................................46

*W.C. & A.N. Miller Development Co. v. Continental Casualty Co.*,
   814 F.3d 171 (4th Cir. 2016) ........................................................28, 34, 45, 46

**Statutes**

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1332 .........................................................................................1

**Other Authorities**

Fed. R. Civ. P 54(b) ...................................................................................1

*Mission,* Securities and Exchange Commission, (Aug. 9, 2023),
   https://www.sec.gov/about/mission.................................................36

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants (the "Insurers")[1] appeal from a judgment of the United States District Court for the District of Maryland, which was certified as final pursuant to Fed. R. Civ. P 54(b) on December 19, 2024.  JA1107-1108; JA1136; JA1148-1149.  The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship.  JA1339.  The Insurers timely filed the Notice of Appeal on January 16, 2025.  JA1150.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.  JA1148-1149.

## PRELIMINARY STATEMENT

The insurance policies at issue deem all related **Claims**[2] to be a single **Claim** made when the first such **Claim** was made.  All **Claims** arising out of "**Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes" are deemed a single **Claim**.  So too are all **Claims** arising out of "facts, circumstances, situations, events or **Wrongful Acts** that are logically or causally related . . . ."  This Court and courts across the

---

[1] The Insurers are: Continental Casualty Company, Swiss Re Corporate Solutions America Insurance Corporation, National Union Fire Insurance Company of Pittsburgh, PA, Freedom Specialty Insurance Company, QBE Insurance Corporation, Argonaut Insurance Company, XL Specialty Insurance Company, Allied World National Assurance Company, and Navigators Insurance Company. JA1150.

[2] Terms in bold are defined in the applicable insurance policies.

country hold that such relatedness standards sweep broadly to encompass all claims with meaningful commonalities, notwithstanding any differences.

The District Court departed from this large body of case law by holding that **Claims** alleging a single ongoing scheme were unrelated. Indeed, the District Court went so far as to hold that a single civil proceeding could be chopped up into multiple **Claims** merely because an amended complaint alleged additional evidence about that scheme.

The relevant facts are straightforward. Under Armour seeks coverage for a securities class action, derivative matters, and government investigations (collectively, the "Underlying Matters"), which all arise out of an alleged fraudulent scheme by which Under Armour and its directors and officers intentionally misled investors about the company's financial position and growth prospects. Under Armour allegedly implemented that scheme by making false and misleading statements about its financial results and by employing a slew of improper sales and accounting practices to support those false statements.

Under Armour reported the first of the Underlying Matters under a tower of claims-made directors and officers ("D&O") liability insurance policies (the "16-17 Policies") issued for the policy period of February 28, 2016 to February 28, 2017 (the "16-17 Policy Period"), which were in effect when shareholder demands were made and the securities class action was filed. That is when the **Claim** was

2

first made.  The other Underlying Matters followed, and the complaint in the securities class action was amended.  Ultimately, the insurers under the 16-17 Policies paid out their entire $100 million combined limits.

In this action, Under Armour seeks to tap an additional $100 million tower of claims-made D&O coverage (the "17-18 Policies") issued for the policy period of March 31, 2017 to March 31, 2018 (the "17-18 Policy Period").  The District Court's decision permitting Under Armour to recover a second $100 million tower of coverage cannot be reconciled with the unambiguous language of the policies or decisions of this Circuit and other courts interpreting similar policy language.

## STATEMENT OF THE ISSUES

1.      The 17-18 Policies define "**Claim**" to include a "civil proceeding … commenced by the service of a complaint."  In the Securities Class Action,[3] plaintiffs filed an initial complaint on February 10, 2017—during the 16-17 Policy Period—and subsequently filed three amended complaints in the same civil proceeding.  Is the Securities Class Action a single "**Claim**" first made on February 10, 2017?

2.      The 17-18 Policies provide that all **Claims** arising out of "**Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event,

---

[3] Terms with initial capital letters not defined in the Preliminary Statement are defined in the Statement of the Case.

transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes" or arising out of "facts, circumstances, situations, events or **Wrongful Acts** that are logically or causally related" shall be deemed to be a single **Claim**. The Underlying Matters all arise out of the same alleged scheme by which Under Armour intentionally misled investors by making false statements about its financial condition and by engaging in improper sales and accounting practices to support those false statements. Are the Underlying Matters deemed a single **Claim**?

3. The Specific Matter Exclusion bars coverage for "that portion of **Loss** on account of any **Claim** resulting from" certain enumerated matters or "any **Wrongful Act** or **Interrelated Wrongful Act** alleged therein." "**Interrelated Wrongful Acts**" for purposes of this exclusion means "**Wrongful Acts** that have as a common nexus the fact, circumstance, situation, event, transaction or series of causally connected facts, circumstances, situations, events or transactions." The initial complaint in the Securities Class Action and certain Derivative Matters are enumerated excluded matters. Does the Specific Matter Exclusion bar coverage for the Underlying Matters?

4. The Prior Notice Exclusion bars coverage for **Loss** on account of that portion of any **Claim** "based upon, arising out of, or attributable to any fact, circumstance, or situation which has been the subject of any written notice given

4

under any directors and officers liability policy of which this Coverage Section is a direct or indirect renewal or replacement . . . ." Under Armour reported the Securities Class Action and certain Derivative Matters during the 16-17 Policy Period. Does the Prior Notice Exclusion bar coverage for the Underlying Matters?

**STATEMENT OF THE CASE**

**I.      The Underlying Matters**

**A.      The Securities Class Action**

On February 10, 2017—during the 16-17 Policy Period—shareholder Brian Breece commenced a securities class action, captioned *In re Under Armour Securities Litigation*, Case No. 1:17-cv-00388-RDB (D. Md.) (the "Securities Class Action" and "SCA"), by serving Under Armour with a putative securities class complaint (the "Breece Complaint"). JA26. The Breece Complaint alleged that, from April 21, 2016 through January 30, 2017, defendants "made false and/or misleading statements as well as failed to disclose material adverse facts about the Company's business, operations, and prospects" through a series of public statements and earnings reports. JA27; JA30-34. Specifically, defendants allegedly "made false and misleading statements and failed to disclose that Under Armour's revenue and profit margins would not be able to withstand[] the heavy promotions, high inventory levels and ripple effects of numerous department store closures and bankruptcy of The Sports Authority, but nevertheless purported itself

5

as a growth company that would continue to develop and market game-changing products." JA27.

According to the Breece Complaint, Under Armour's "continued guidance . . . that the Company would maintain its trend of greater than 20% sales growth" did not have "any basis in fact and [was] false when made." JA28. Ultimately, "Under Armour's twenty-six consecutive quarters of greater than 20% sales growth came to a halt on Tuesday, January 31, 2017, when Under Armour announced . . . weaker-than-expected fourth quarter earnings, and that its Chief Financial Officer . . . would be unexpectedly stepping down." JA28.

On March 23, 2017, the District Court consolidated the Breece Complaint with two other putative securities class actions. *See* SCA, ECF No. 3. Lead plaintiffs filed a consolidated amended complaint on August 9, 2017, and a consolidated second amended complaint on November 16, 2018 (the "SAC"). *See* SCA, ECF No. 30; JA56.

The SAC similarly alleged that, from September 16, 2015 to January 30, 2017, defendants "misrepresented the demand for the Company's products, sales, and pricing while downplaying issues related to margins, inventory, and retailer bankruptcies." JA97. Specifically, according to the SAC, defendants repeatedly touted that, "[f]or 26 consecutive quarters, spanning from the second quarter of 2010 . . . to the third quarter of 2016 . . . Under Armour reported a compounded

6

annual growth rate of 20% or more." JA61. In reality, Under Armour allegedly

was "experiencing a monumental downturn in its primary sales channel, North

American wholesale," which "worsened over time." JA72-73. Nevertheless,

defendants "trumpeted explosive growth and strong customer demand, while

downplaying and concealing the Company's ballooning inventory, liquidations,

and gross margin compression." JA62. According to the SAC, defendants

engaged in improper sales and accounting practices, such as offering "heavy

discounts, promotions, lower sales prices, and buyback arrangements," designed to

hide the financial realities facing Under Armour so that they could "continue to

report revenue growth, meeting [Under Armour CEO Kevin] Plank's aggressive

20% growth projections." JA72.

On August 19, 2019, the District Court dismissed the Securities Class

Action. *See* SCA, ECF No. 99. The Securities Class Action plaintiffs appealed to

this Court. *See* SCA, ECF No. 102.

On November 3, 2019, while the appeal was pending, the *Wall Street

Journal* ("*WSJ*") reported that the DOJ and the SEC had been conducting parallel

investigations into Under Armour since at least July 2017 (the "Government

Investigations"). *See* SCA, ECF No. 106-4. According to the *WSJ*, the

government was "investigating Under Armour Inc.'s accounting practices in a

probe examining whether [Under Armour] shifted sales from quarter to quarter to

7

appear healthier," noting that Under Armour's streak of "26 straight quarters of at least 20% year-over-year revenue growth . . . ended abruptly when Under Armour missed its sales targets in the final quarter of 2016." *Id.* at 3. Under Armour's stock reportedly "plunged" on January 31, 2017 "after it reported sales growth of only 12% in the holiday quarter and cut its growth forecasts for the next year." *Id.*

On November 14, 2019, the *WSJ* reported that former Under Armour executives "said they scrambled to meet aggressive sales targets, borrowing business from future quarters to mask slowing demand in 2016." *See* SCA, ECF No. 106-7 at 2. This article also reported that the government was investigating practices Under Armour used to "help extend a 26-quarter streak of 20% sales growth," including "pulling sales forward" and "lean[ing] on retailers to take products early and redirect[ing] goods intended for the company's factory stores to off-price chains to book sales in the final days of a quarter." *Id.*

On November 18, 2019, based on the *WSJ* articles, the Securities Class Action plaintiffs filed a Motion for Indicative Ruling and a Motion for Relief from the Court's September 9, 2019 judgment. *See* SCA, ECF No. 105 at 2-3.

Plaintiffs also moved to consolidate the Securities Class Action with several new securities class actions filed in the wake of the *WSJ* articles, characterizing the new lawsuits as "Related Actions," and stating "[a]t the heart of the Related Actions is Under Armour's scheme to mask slowing demand between late 2015

8

and early 2017 and its unsuccessful attempt to conceal that the Company's 20-plus quarter streak of at least 20% net revenue growth had come to an end." SCA, ECF No. 131-1 at 5. Plaintiffs noted that "the Related Actions bring nearly identical claims under the Exchange Act and Rule 10b-5 as a result of the same fraud, perpetrated by the same core defendants, at the same company, in connection with the same securities during an overlapping time period" and "[t]he Related Actions are also based on many of the same 'public statements and reports.'" *Id*. at 9. Plaintiffs sought to "incorporate the new evidence exposed by the *WSJ* into a consolidated complaint which will set forth the strongest and most inclusive securities fraud case practicable related to Under Armour's scheme to sustain its growth streak at all costs in the shadow of weakening demand." *Id.* at 10.

The District Court granted the Motion for Indicative Ruling, concluding that the reports on the Government Investigations provided "new evidence" meriting relief from the prior judgment and also "support[ed] the conclusion that Under Armour and Plank knew that demand for their products was waning, resorted to risky sales tactics to keep the numbers intact, and intentionally misrepresented the level of demand for their products." *See* SCA, ECF No. 139 at 1-2, 10-14. It rejected Under Armour's assertion that the Government Investigations, which began in July 2017, could not provide "information about Plank's state of mind during the Class Period, which does not extend beyond January 30, 2017." *Id.* at

14. The District Court noted that Under Armour's argument "reflects a narrow view of the Plaintiffs' allegations," which "also allege that Under Armour engaged in questionable sales tactics and accounting practices during the Class Period." *Id.* According to the District Court, "Under Armour's subsequent disclosure that its accounting practices have been under federal investigation is merely one factor this Court must consider when examining the totality of the Plaintiffs' allegations." *Id.*

This Court remanded the Securities Class Action on August 13, 2020. *See In re: Under Armour Sec. Litig.*, No. 19-2032 (4th Cir. 2020), ECF No. 64. On remand, the District Court consolidated the related securities class actions and directed lead plaintiffs to file a third amended complaint. *See* SCA, ECF No. 150 at 2-3.

On October 14, 2020, lead plaintiffs filed a consolidated third amended complaint (the "TAC"). JA170. Like the prior complaints, the TAC alleged that Under Armour intentionally misled investors by misrepresenting "the demand for the Company's products, sales, and pricing while downplaying issues related to margins, inventory, and retailer bankruptcies." JA234. According to the TAC, defendants repeatedly touted that, "[f]or 26 consecutive quarters, spanning from the second quarter of 2010 . . . to the third quarter of 2016 . . . Under Armour reported a compounded annual growth rate of 20% or more." JA176. Defendants allegedly "[mis]led the market to believe that the Company's incredible growth

streak would continue." JA177. "In reality, however, the Company was experiencing a severe decline in its apparel business due to its 'brand heat' (*i.e.,* customer demand) dying." JA177.

Adding facts developed since the filing of Breece Complaint, the TAC alleged that Under Armour employed "suspect sales practices [that] enabled the Company to increase quarterly revenue, mask slowing demand for Under Armour products, and extend the 26-quarter streak of 20% sales growth"—thus fueling Under Armour's false and misleading statements about its financial condition and prospects. JA178-179. According to the TAC, defendants "resorted to a slew of improper and/or concealed sales and accounting practices that violated Generally Accepted Accounting Principles ('GAAP') and SEC regulations," such as (1) pulling forward sales from future quarters; (2) leaning on retailers to take products early; (3) shipping products in the final days of the quarter, thereby "resulting in the return of truckloads of unopened boxes of inventory;" (4) shipping new inventory to off-price sellers so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at Under Armour's stores; and (5) continuing to ship products to Sports Authority, even after it was clear that Sports Authority was going bankrupt and the revenue would not be collectible. JA178 (footnote omitted). Plaintiffs alleged that these

11

"suspect sales practices" were "unsustainable" because they were "robbing from future quarters." JA178-179.

Further, "[r]ather than explain to the market that brand heat for the Company's apparel was dying and that the Company was forced to employ improper accounting and sales tricks to maintain a façade of consistent growth, Defendants falsely claimed that Under Armour apparel sales were stronger than ever" and "trumpeted explosive growth and strong customer demand, while downplaying and concealing the Company's suspect sales practices, declining brand heat, ballooning inventory, liquidations, and gross margin compression." JA179. According to plaintiffs, these misrepresentations caused Under Armour's stock prices to be "artificially inflated" and "Plank personally cashed in on this artificial inflation . . . by selling a substantial amount of his Company stock." JA180.

Plaintiffs contended the truth began to emerge when Under Armour's "purported growth streak came to a crashing halt in the fourth quarter of 2016." JA181. Nevertheless, defendants allegedly "continued to conceal the full truth from investors, including the illicit sales practices they had used to buoy sales growth for more than a year and that the DOJ and SEC were investigating the Company's revenue-recognition, accounting and sales practices, [Under Armour's former CFO Chip] Molloy's tenure, and its late 2016 results." JA182. According

12

to the TAC, the full truth was not revealed until the *WSJ* reported on the

Government Investigations.  JA182-183.

On May 18, 2021, the Court denied Under Armour's motion to dismiss the

TAC and later granted plaintiffs' Motion for Class Certification.  *See* SCA, ECF

No. 173 at 15; SCA, ECF No. 245 at 37.  The parties to the Securities Class Action

reached a settlement, which included a payment of $434 million.  *See* SCA, ECF

No. 430-1.  The District Court dismissed the Securities Class Action with prejudice

on November 7, 2024.  *See* SCA, ECF No. 450.

### B.      The Derivative Matters[4]

In addition to the Breece Complaint, Under Armour received a books and

records demand and a derivative demand from shareholder Chad Sorensen and a

derivative demand from shareholder Shawn Luger during the 16-17 Policy Period.

*See* JA817 (the "Sorensen Books and Records Demand"); JA832 (the "Sorensen

Derivative Demand"); JA363 (the "Luger Derivative Demand").  The Sorenson

Books and Records Demand alleged that Under Armour made "false and

misleading statements about the effect of the bankruptcy of one of the Company's

wholesale national retailers, the Sports Authority . . . on the Company's financial

outlook" between January and April 2016, which led to an "artificial inflation in

---

[4] The derivative demands and derivative actions are referred to collectively as the "Derivative Matters."

Under Armour's stock price[.]" JA832.  Specifically, Under Armour allegedly misrepresented that its 20% growth streak would continue in 2016 with a net revenue growth of 25%.  JA833-834.

A few months later, the Luger Derivative Demand likewise alleged that "[d]espite Management's outward votes of confidence and assurances that Under Armour would continue as a force in the sports retail market [throughout 2016], Management was aware of the decreasing growth margins and over surplus of unsold inventory, and knew that would be the last of twenty-six consecutive quarters with greater than 20% revenue growth."  JA368.  Luger alleged the "truth" was revealed on January 31, 2017, when Under Armour announced earnings for the fourth quarter of 2016 and its CFO's departure.  JA368.  Luger further alleged that, while the stock price was artificially inflated, "Plank (and possibly other members of Management) was doing everything he could to sell his shares and stave off personal losses."  JA369.

Subsequently, during the 17-18 Policy Period, Under Armour received additional similar derivative demands, several of which resulted in derivative actions, including: (1) *James Kenney v. Kevin Plank*, No. 24-C-18-003939 (Md. Cir. Ct., Balt. City Cnty.) and (2) *Balraj Paul v. Kevin Plank*, No. 1:18-cv-02239 (D. Md.), *appeal docketed*, 24-1144 (4th Cir.) (collectively, the "Consolidated Derivative Actions").  *See, e.g.*, JA372; JA382; JA387.  Like the Securities Class

14

Action, the Consolidated Derivative Actions alleged that Under Armour misled investors about "the demand for [Under Armour's] products, sales, and pricing while downplaying issues related to margins, inventory, and retailer bankruptcies." JA961; *see also* JA842. The Consolidated Derivative Actions also alleged that Under Armour improperly reported and projected a quarterly "20% sales growth" during the relevant period. JA929; JA842.

### C. The Government Investigations

███████████████████████████████████████████████████

███████████████████████████████████████████.

In July 2020, the SEC issued Wells Notices to Under Armour, Plank, and David Bergman (the "Wells Notices"), advising that "the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the Executives that would allege certain violations of the federal securities laws." JA396. Under Armour's July 22, 2020 Form 8-K described the Wells Notices as "relat[ing] to the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of 'pull forward' sales in connection with revenue during those quarters. . . . Specifically, the SEC Staff is focused on the Company's disclosures regarding the use of pull forward sales in order to meet sales objectives." JA396. ████████████████████████████████████████████, the SEC was targeting information related to the Under Armour's alleged conduct regarding misleading investors about its financial condition.

On May 3, 2021, around six months after the TAC was filed, the SEC issued an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order (the "SEC Order"), which focused on "Under Armour's failure to disclose material information about

16

its revenue management practices that rendered statements it made misleading." JA1096. The SEC Order found that, "[f]or 26 consecutive quarters, beginning in the second quarter of 2010, Under Armour's reported year-over-year revenue growth exceeded 20%, and Under Armour repeatedly highlighted this growth streak in earnings calls and earnings releases." JA1096. According to the SEC, to maintain this façade, Under Armour began to "accelerate, or 'pull forward' existing orders that customers had requested be shipped in future quarters that could be completed in the current quarter to close the gap between its internal forecasts and analysts' revenue estimates." JA1096. The SEC Order states that Under Armour used pull forward sales to meet analysts' revenue estimates for six quarters from the third quarter of 2015 through the fourth quarter of 2016. JA1096.

Ultimately, the SEC Order determined that Under Armour's public statements were "materially misleading" to investors. JA1096. "In particular," the SEC found that Under Armour made misleading "positive statements regarding its revenue growth rate and the factors contributing to the revenue growth rate." JA1096. The SEC identified many of the same misleading public statements as the Breece Complaint, including in connection with Under Armour's April 21, 2016, July 26, 2016, and October 25, 2016 earnings reports. *See* JA1096-1097, JA1099-1100; JA30-34. For example, both the SEC Order and the Breece Complaint

identified the same misrepresentation that Under Armour made in the third quarter of 2016 when it highlighted its 26th consecutive quarter of 20%-plus revenue growth.  JA1100-1101; JA33.  Also, like the Breece Complaint, the SEC concluded that the truth about Under Armour's finances was revealed on January 31, 2017, when Under Armour announced that it did not meet analysts' revenue estimates and did not continue its 20% growth streak.  JA1102; JA28.  As a result of Under Armour's alleged scheme to mislead investors, it agreed to pay a $9 million civil penalty to the SEC to resolve the Government Investigations. JA1105.

### D.     Under Armour's Request for Coverage

Under Armour sought coverage for the Underlying Matters under both the 16-17 and 17-18 Policies.  JA1347-1348; JA1370-1371.  According to Under Armour, the "portions" of the Securities Class Action and Derivative Matters that focus on Under Armour's "public statements" are **Claims** first made during the 16-17 Policy Period, while the "portions" of the Securities Class Action and Derivative Matters that focus on Under Armour's "accounting practices" and the Government Investigations are **Claims** first made during the 17-18 Policy Period. JA1386-1387.

Under Armour reported the earliest of the Underlying Matters—including the Breece Complaint, Sorensen Books and Records Demand, Sorensen Derivative

18

Demand, and Luger Derivative Demand—when they were made during the 16-17 Policy Period. JA1347; JA1370. The 16-17 Insurers accepted the Underlying Matters as a single Claim, pursuant to the terms of those policies, because they all involve the same Wrongful Act or Interrelated Wrongful Acts, as those terms are defined in the 16-17 Policies. JA1347-1348; JA1371. The $434 million settlement of the Securities Class Action far exceeded the limits of the $100 million insurance tower for the 16-17 Policy Period. *See* SCA, ECF No. 430-1 at 1. The 16-17 Policies therefore are not at issue in this litigation.

In this action, Under Armour seeks coverage for the Underlying Matters under the 17-18 Policies, which comprise a separate $100 million insurance tower for **Claims** *first made* during the 17-18 Policy Period. The 17-18 Policies are comprised of a primary policy issued by Endurance American Insurance Company (the "17-18 Primary Policy") and excess policies issued by the Insurers, which, unless otherwise stated, provide coverage that follows form to the 17-18 Primary Policy upon exhaustion of the underlying policy(ies). *See* JA458-524; JA544-703.

As relevant here, the 17-18 Primary Policy provides the following coverage:

B. Company Indemnification

> The Insurer shall pay on behalf of the **Company** all **Loss** for which the **Company** grants indemnification to the **Insured Persons** and which the **Insured Persons** have become legally obligated to pay on account of a **Claim** first made against the **Insured Persons** during the **Policy Period** . . . for any

19

> **Wrongful Acts** taking place prior to the earlier of the end of the **Policy Period** . . .

> C.     Company Securities Liability

> The Insurer shall pay on behalf of the **Company** all **Loss** for which the **Company** becomes legally obligated to pay on account of a **Securities Claim** first made against the **Company** during the **Policy Period** . . . for a **Wrongful Act** taking place prior to the earlier of the end of the **Policy Period** or commencement of the **Run-Off Coverage Period**.

JA474, JA510.

> The 17-18 Primary Policy defines "**Claim**" to include, in relevant part:

> 1. a written demand for monetary damages or other relief, including but not limited to, a demand for injunctive relief, against any **Insured** for a **Wrongful Act**, commenced by the **Insured's** receipt of such demand,

> 2. a civil proceeding against any **Insured** for a **Wrongful Act**, commenced by the service of a complaint or similar pleading; . . .

> 6. a formal administrative or regulatory proceeding against any **Insured** for a **Wrongful Act**, commenced by the filing of a notice of charge, formal investigative order or similar document;

> 7. a **Formal Investigation** of an **Insured**; . . .

JA496-497. The base form of the 17-18 Primary Policy contains a Single Claims

provision:

> All **Claims** which arise out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of **Insureds** shall be deemed one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**.

JA466 (the "Base Form Single Claims Provision").

"**Interrelated Wrongful Acts**" means "all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes."  JA464.  "**Wrongful Act**" means, in relevant part, "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any of the **Insured Persons** . . . or with respect to Insuring Agreement C, by the **Company**."  JA477.

Endorsement 4 to the 17-18 Primary Policy provides that the Base Form Single Claims provision "is amended by the addition of" the following:

> All **Claims** and **Inquiries** that arise out of the same fact, circumstance, situation, event, or **Wrongful Act**, or facts, circumstances, situations, events or **Wrongful Acts** that are logically or causally related shall be deemed one **Claim**, which shall be deemed to be first made on the earliest that the first of any such **Claims** is made, or the first of any such **Inquiries** is received by an **Insured Person** ...

JA491 (the "Endorsement 4 Single Claims Provision") (collectively, with the Base Form Single Claims Provision, the "Single Claims Provision").

The 17-18 Primary Policy also contains two relevant exclusions.  First, the 17-18 Primary Policy excludes:

> that portion of **Loss** on account of any **Claim** resulting from any litigation, claim, proceeding, event, or other matter described below, or any **Wrongful Act** or **Interrelated Wrongful Act** alleged therein:

21

- [Sorenson Books and Records Demand][5]

- [Sorenson Derivative Demand]

- [Breece Complaint]

- [Luger Derivative Demand]

**Interrelated Wrongful Acts** means the **Wrongful Acts** that have as a common nexus the fact, circumstance, situation, event, transaction or series of causally connected facts, circumstances, situations, events or transactions.

JA494 (the "Specific Matter Exclusion").

Second, the 17-18 Primary Policy excludes:

… **Loss** on account of that portion of any **Claim** made against any Insured:

1.      based upon, arising out of, or attributable to any fact[s], circumstance[s] or situation which has been the subject of any written notice given under any directors and officers liability policy of which this Coverage Section is a direct or indirect renewal or replacement and accepted by the insurer of such policy as a notice of circumstances...

JA501 (the "Prior Notice Exclusion").

The Insurers denied coverage for the Underlying Matters because they are not a **Claim** first made during the 17-18 Policy Period and because the Specific Matter Exclusion and Prior Notice Exclusion each separately and independently bars coverage.  JA1353-1359.  Under Armour disputed this position, and this coverage litigation ensued.  JA1373-1377.

---

[5] Each subparagraph includes a detailed description of the notice given to the insurers under the 16-17 Policies regarding the referenced Underlying Matter.

## II.    The District Court's Decision

On March 26, 2024, the District Court entered a Sealed Memorandum Opinion and Order, denying the Insurers' motion for judgment on the pleadings ("MJOP") and granting Under Armour's MJOP.  JA1107-1108; JA1865-1892; *see also* JA1109-1136.

The District Court held that the Endorsement 4 Single Claims Provision did not add a paragraph to the Base Form Single Claims Provision but instead replaced the Base Form Single Claims Provision, characterizing the Endorsement 4 Single Claims Provision as "significantly narrower."  JA1129.  The District Court then asserted that the Breece Complaint "centered on allegations of false and overly optimistic public statements about Under Armour's net revenue projections and growth rates, and allegedly misleading statements regarding inventory growth, discounting, and margin decline."  JA1129.  According to the District Court, the Government Investigations and later Derivative Matters instead focused on certain "sales and accounting practices" employed by Under Armour (JA1129-1130, JA1133) which were "wholly absent from the Breece Complaint and the earlier shareholder demands made during the 2016-2017 Policy Period" (JA1133).  Finding that **Claims** based on those two sets of allegations are not "logically or causally related" because they "involve different parties, focus on overlapping, but not identical, time periods, raise different theories of liability, rely on different

evidence, and seek different relief," the District Court held that the Government Investigations and the later Derivative Matters did not fall within the Endorsement 4 Single Claims Provision and thus were **Claims** first made during the 17-18 Policy Period. JA1130; JA1133.

The District Court also held that the TAC in the Securities Class Action could be divided into two separate **Claims** because the TAC added new alleged **Wrongful Acts** regarding Under Armour's alleged improper sales and accounting practices, notwithstanding that the amended complaint was filed as part of a single civil proceeding. JA1131-1132. On that basis, the District Court held that the "portion" of the Securities Class Action that "results from the findings of the government investigations and [was] subsequently added to the securities class action after the SEC Order" was a separate unrelated **Claim** first made during the 17-18 Policy Period. JA1132.

Based on similar reasoning, the District Court determined that neither the Specific Matter Exclusion nor the Prior Notice Exclusion barred coverage for the Underlying Matters. JA1133-1136.

## SUMMARY OF THE ARGUMENT

The District Court's decision cannot be reconciled with the controlling policy language or the consensus of a substantial body of case law in this Circuit and nationwide.

24

1.  The 17-18 Policies define **Claim** to include a "civil proceeding . . . commenced by the service of a complaint or similar pleading."  Courts consistently hold that a single lawsuit is a single Claim, regardless of whether an amended complaint is filed.  The amended complaints in the Securities Class Action did not "commence" a new "civil proceeding" and are not a separate **Claim** from the **Claim** made by the service of the Breece Complaint.  The Securities Class Action, as a whole, is a **Claim** first made during the 16-17 Policy Period and so not first made (and therefore not covered) under the 17-18 Policies.

2.  The District Court erred in holding that the Endorsement 4 Single Claims Provision replaced the Base Form Single Claims Provision.  Endorsement 4 explicitly provides that it is *adding* a paragraph to the Base Form Single Claims Provision.  The same Endorsement specifies when it is *replacing* a provision in the base form.  Contrary to the District Court's assertion, the two paragraphs of the amended Single Claims Provision are easily reconciled; a **Claim** is related if either standard is met.

Thus, as amended, the Single Claims Provision provides **Claims** are related if they arise out of either (a) the same **Wrongful Act** or **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes; or (b) the same fact, circumstance, situation, event, or **Wrongful Act**, or

25

facts, circumstances, situations, events or **Wrongful Acts** that are logically or causally related.

3. By their plain language, the formulations in both paragraphs of the amended Single Claims Provision sweep broadly and each alone is sufficient to deem the Underlying Matters a single **Claim**. Confirming that point, in construing the same and similar policy language, this Court, other courts within this Circuit, and courts nationwide hold that Claims with any meaningful connection are related, even if there are also differences among the Claims.

Here, the Underlying Matters all arise out of the same alleged scheme to conceal Under Armour's true financial condition and growth prospects from investors. As part of that scheme, Under Armour allegedly (a) made false and misleading statements about its finances to mislead investors about its ability to continue its 20% growth streak; and (b) engaged in improper sales and accounting practices to cook the books and support its false statements about its finances and 20% growth streak. The "relatedness" of these allegations is manifest; the improper sales and accounting practices enabled the false statements about Under Armour's financial condition by aligning the statements with the records.

Thus, the two sets of allegations identified by the District Court are closely connected and related under any reasonable standard. Indeed, in a different context, the District Court itself recognized that the allegations are related when it

26

granted the Motion for Indicative Relief and permitted the filing of the consolidated TAC. Moreover, the conclusion that the Underlying Matters are related, and so deemed a single **Claim**, follows *a fortiori* from decisions of this Court and courts nationwide holding Claims less closely connected to be related. The Underlying Matters thus are related and deemed a single **Claim** first made before the 17-18 Policy Period.

4. Although there is no need to reach the issue, the Specific Matter Exclusion and Prior Notice Exclusion each separately and independently bars coverage. The Specific Matter Exclusion applies because the Underlying Matters all result from expressly excluded matters (including the Breece Complaint, the Sorensen Books and Records Demand, the Sorensen Derivative Demand, and the Luger Derivative Demand) or conduct alleged therein. The Prior Notice Exclusion bars coverage because the Underlying Matters are based upon, arise out of, or are attributable to facts, circumstances, or situations reported to Under Armour's insurers for the 16-17 Policy Period.

5. Finally, regarding an issue the District Court did not reach but that Under Armour may raise as an alternative ground for affirmance as to some of the Insurers, the Specific Investigation Exclusion ("SIE") in the primary policy issued for the 2019-2021 policy period (the "19-21 Primary Policy") does not reflect an agreement that the Government Investigations and related matters "trigger"

coverage only under the 17-18 Policy Period.  The 19-21 Primary Policy is a separate contract that neither amends nor creates coverage under the 17-18 Primary Policy.  Moreover, the SIE on its face shows that coverage under the 17-18 Policies is subject to the terms of those policies.

## STANDARD OF REVIEW

This Court reviews *de novo* the District Court's denial of the Insurers' MJOP and its grant of Under Armour's MJOP.  *See W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.,* 814 F.3d 171, 175 (4th Cir. 2016).  "A motion for judgment on the pleadings should be granted when, accepting all facts pled by the nonmoving party as true and drawing all reasonable inferences from the facts in favor of the nonmoving party, the movant has clearly established that no material issue of fact remains and that the movant is entitled to judgment as a matter of law."  *Deutsche Bank Nat'l Tr. Co. Tr. for IndyMac INDX Mortg. Loan Tr. 2006-AR12 v. Fegely*, 767 F. App'x. 582, 583 (4th Cir. 2019) (Mem.).

Under Maryland law, "insurance policies are interpreted in the same manner as contracts generally; there is no rule in Maryland that insurance policies are to be construed most strongly against the insurer."  *Catalina Enters., Inc. Pension Tr. v. Hartford Fire Ins. Co.*, 67 F.3d 63, 65 (4th Cir. 1995).  "When the language of a contract is unambiguous, a court shall give effect to its plain meaning and there is

no need for further construction by the court." *Mitchell v. AARP Life Ins. Program, N.Y. Life Ins. Co.*, 779 A.2d 1061, 1069 (Md. Ct. Spec. App. 2001).

## ARGUMENT

**I.     None of the Underlying Matters is a Claim first made during the 17-18 Policy Period.**

None of the Underlying Matters is a **Claim** *first* made during the 17-18 Policy Period.  Rather, each of the Underlying Matters is either itself a **Claim** first made during the prior 16-17 Policy Period or is deemed part of a single **Claim** first made during the 16-17 Policy Period by virtue of the Single Claims Provision. Consequently, the 17-18 Policies do not provide coverage for the Underlying Matters.

### A.     The Securities Class Action, in its entirety, is a "Claim" first made before the 17-18 Policy Period.

The 17-18 Policies define "**Claim**" to mean, in relevant part, "a civil proceeding against any **Insured** for a **Wrongful Act**, commenced by the service of a complaint or similar pleading."  JA496.  The Securities Class Action is a civil proceeding against Under Armour and its directors and officers alleging a scheme to conceal Under Armour's true financial condition from investors through various tactics, including misleading statements and improper sales and accounting practices designed to inflate Under Armour's reported earnings and sales growth. That civil proceeding was commenced by service of the Breece Complaint on February 10, 2017.  JA26; SCA, ECF 131-1 at 2.  As a single "civil proceeding,"

29

the Securities Class Action, including the amended complaints, is a single "**Claim**" first made before the 17-18 Policies incepted on March 31, 2017.

The District Court erroneously held, without citing a single case, that because "**Claim**" includes a civil proceeding against an **Insured** "for a **Wrongful Act**," the Securities Class Action could be split into two **Claims** where "an amended complaint adds allegations as to a *different* Wrongful Act." *See* JA1131-1132. In its view, there is "no basis in the 2017-2018 Primary Policy's definition of Claim to treat the new allegations automatically as part of the same Claim as the Wrongful Acts alleged in the original Breece Complaint." JA1132. That conclusion is demonstrably wrong.

In *Hanover Insurance Co. v. R.W. Dunteman Co.*, 446 F. Supp. 3d 336 (N.D. Ill. 2020), *aff'd*, 51 F.4th 779 (7th Cir. 2022), the court expressly rejected the reasoning on which the District Court based its conclusion. In that case, the policy similarly defined "Claim" to include a "[c]ivil proceeding commenced by the service of a complaint … against an Insured Individual *for a Wrongful Act*." *Id.* at 340 (emphasis added). The insured argued that an amended complaint constituted a new claim under the policy because it alleged new wrongful acts. *Id.* at 345. The district court disagreed, holding that "the Wrongful Acts language must be read in the context of the unambiguous definition of Claim." *Id.* Because a "civil proceeding can only be commenced once," the district court held that "a new

30

Claim did not arise with the filing of the [amended complaint]," regardless of whether it alleged new Wrongful Acts. *Id.*

On appeal, the Seventh Circuit affirmed, holding an amended complaint does not constitute a new claim under "a straightforward application of the policy language." 51 F.4th at 787. The court of appeals noted that discovery often reveals evidence that prompts plaintiffs "to elaborate on [their] allegations of wrongdoing and add theories of relief" in an amended complaint. *Id.* Those new allegations and legal theories do not change the fact that "[a] 'claim' taking the form of 'a civil proceeding commenced by the service of a complaint' spans the *entire* civil action, not just the legal theories and factual allegations in the complaint that commenced the action." *Id.* (emphasis added).

Other state and federal courts across the country likewise routinely hold that, under definitions of "claim" similar or identical to that here, a "civil proceeding" constitutes a single claim, which cannot be divided into multiple separate claims. *See, e.g.*, *Horn v. Liberty Ins. Underwriters, Inc.*, 998 F.3d 1289, 1294 (11th Cir. 2021) ("Interpreting the term 'Claim' here is simple because the insurance policy itself clearly and thoroughly defines the term as 'a civil proceeding against any Insured commenced by the service of a complaint or similar pleading.' . . . [T]herefore, the claim [here] is the civil proceeding against [the insured] commenced by the service of the class action complaint."); *Nat'l Union Fire Ins.*

*Co. of Pittsburgh, Pa. v. Willis*, 296 F.3d 336, 342 (5th Cir. 2002) (amended complaint is not a new "Claim" because "amended complaints cannot commence a civil proceeding that has already been commenced by the filing and service of the initial complaint"); *Cmty. Found. for Jewish Educ. v. Fed. Ins. Co.*, 16 F. App'x 462, 466 (7th Cir. 2001) (same).[6]

The District Court thus erred in holding that the Securities Class Action can be divided into multiple **Claims** because the TAC added "allegations as to a *different* **Wrongful Act**." As the Seventh Circuit noted in *R.W. Dunteman Co.*, plaintiffs routinely amend an initial complaint to add supporting facts and legal theories as additional information becomes available. 51 F.4th at 787. That is exactly what the Securities Class Action plaintiffs did here. This common practice in no way *commences* a new civil proceeding. The District Court's conclusion that a single civil proceeding can be divided into multiple **Claims** cannot be reconciled with the controlling policy language; a lawsuit is "a civil proceeding . . .

---

[6] *See also Gregory v. Navigators Ins. Co.*, No. 23-17-cv, 2023 WL 8538173, at *2 (2d Cir. Dec. 11, 2023); *Fed. Ins. Co. v. Raytheon Co.*, 426 F.3d 491, 497 (1st Cir. 2005); *CapWealth Advisors, LLC v. Twin City Fire Ins. Co.*, No. 23-5359, 2024 WL 1134647, at *3 (6th Cir. Mar. 15, 2024); *Jerry's Enters., Inc. v. U.S. Specialty Ins. Co.*, 845 F.3d 883, 888 (8th Cir. 2017); *Tarter v. Navigators Ins. Co.*, No. 21-5129, 2021 WL 4950375, at *2 (6th Cir. Oct. 25, 2021); *Mkt. St. Bancshares, Inc. v. Fed. Ins. Co.*, 962 F.3d 947, 954 (7th Cir. 2020); *UBS Fin. Servs., Inc. of P.R. v. XL Specialty Ins. Co.*, 929 F.3d 11, 24 (1st Cir. 2019).

commenced by the service of a complaint," regardless of whether an amended complaint is subsequently filed.

**B. The Underlying Matters all allege a single fraudulent scheme and are, therefore, deemed a single Claim first made before the 17-18 Policy Period.**

**1. The District Court committed numerous threshold errors in interpreting the Single Claims Provision.**

Consistent with claims-made policies generally, the 17-18 Policies do not provide coverage for **Claims** first made or deemed first made before the 17-18 Policy Period. Under the Base Form Single Claims Provision, all **Claims** arising out of the same **Wrongful Act** or **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes are deemed to be a single **Claim** first made when the earliest of the related **Claims** was made. JA466; JA464. Endorsement 4 adds a second paragraph to that provision, under which all **Claims** arising out of "facts, circumstances, situations, events or **Wrongful Acts** that are logically or causally related" are also deemed to be a single **Claim**. JA491.

The District Court held that the Endorsement 4 Single Claims Provision replaced the Base Form Single Claims Provision. JA1129. That conclusion contradicts the plain language of Endorsement 4, which specifies that the Base Form Single Claims Provision is amended "by the addition of" the Endorsement 4

Single Claims Provision.  JA491.  In contrast, the next five sections in
Endorsement 4 state that they are "replacing" other provisions of the base policy
form.  JA491-492.  Under basic principles of contract interpretation, "add" means
"to include" not "replace."  *McWhorter v. Bankers Standard Ins. Co.*, 611 F. Supp.
3d 3, 22 (D. Md. 2020) (holding "[t]he word 'added' [in an endorsement] makes it
unambiguous that the Policy does not remove or replace the existing … exclusion,
it simply adds additional exclusions.").

Moreover, contrary to the District Court's analysis, there is nothing
inconsistent about including two paragraphs with alternative formulations within
the Single Claims Provision; they are easily harmonized by giving each of the
paragraphs its natural meaning and deeming **Claims** falling within *either*
formulation a single **Claim**.

The District Court also erred in holding that the "logically or causally
related" standard used in the Endorsement 4 Single Claims Provision is
"significantly narrower" than the "common nexus" standard used in the Base Form
Single Claims Provision.  *See* JA1129.  The two standards are closely comparable,
both are exceedingly broad, and courts have treated them as interchangeable.  *See*,
*e.g.*, *W.C. & A.N. Miller Dev. Co.*, 814 F.3d at 176-77 (claims were related because
they shared a "common nexus" of fact where policy provision used "logically or
causally connected" standard); *Cont'l Cas. Co. v. AWP U.S., Inc.*, No. 3:19cv661,

2021 U.S. Dist. LEXIS 64136, *37 (E.D. Va. Mar. 31, 2021) (same); *RLI Ins. Co. v. OutsideIn Architecture, LLC*, 692 F. Supp. 3d 1077, 1100 (M.D. Fla. 2023) (applying "sufficient factual nexus" test when policy provision used "logically or causally connected" standard).

Finally, the District Court erred in holding that the Single Claims Provision should be treated as an exclusion and so construed against the 17-18 Insurers. *See* JA1128. The Single Claims Provision serves to determine when a **Claim** is deemed first made and as such is not an exclusion. *See, e.g.*, *Taylor v. Sec. Nat'l Ins. Co.*, No. 6:17-cv-2379-DCC, 2018 WL 1210563, at *6 n.2 (D.S.C. Mar. 8, 2018) (declining to treat relatedness provision as an exclusion); *ADI Worldlink, LLC v. RSUI Indem. Co.*, No. 4:16-cv-665-ALM-CAN, 2017 WL 6403047, at *14 (E.D. Tex. Aug. 16, 2017) (holding that it "would defy reason" to treat the Interrelated Condition like an exclusion).

> **2. The Underlying Matters fall within the Single Claims Provision because they all arise out of the same scheme to misrepresent Under Armour's financial condition and growth prospects.**

The relatedness issue boils down to a single question: do **Claims** alleging that Under Armour made false and misleading statements to misrepresent its financial condition and growth prospects and **Claims** alleging that it also used accounting gimmicks to misrepresent its financial condition and growth prospects either: (1) arise out of the same **Wrongful Act** or **Wrongful Acts** that have as a

35

common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes (the first paragraph of the amended Single Claims Provision standard); or (2) arise out of the same fact, circumstance, situation, event, or **Wrongful Act**, or facts, circumstances, situations, events or **Wrongful Acts** that are logically or causally related (the second paragraph of the amended Single Claims Provision standard). Under either standard, the answer is "yes."

a. **The Underlying Matters arise out of the same Wrongful Acts.**

As an initial matter, the Underlying Matters constitute a single **Claim** first made prior to the 17-18 Policy Period under both paragraphs of the Single Claims Provision because they arose out of the same **Wrongful Acts**. Under Armour allegedly made false statements about its financial condition and growth prospects to mislead investors. The **Wrongful Acts** were the false public statements which mislead investors. These same false statements given to investors in 2016 were the basis of the Breece Complaint, the basis of the amended complaints, and the basis of the SEC's investigation as part of its mission to protect investors by ensuring "[c]ompanies offering securities for sale to the public must tell the truth about their business . . . ." *Mission,* Sec. Exch. Comm'n, (Aug. 9, 2023), https://www.sec.gov/about/mission. Under Armour's misleading public statements during this time period are the "same" **Wrongful Acts**.

The Breece Complaint alleged that between April 21, 2016 and January 30, 2017, Under Armour "materially misled the investing public . . . by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make their own statements not false and misleading." JA40. The lawsuits that were consolidated with the Securities Class Action in 2019 were "based on many of the same 'public statements and reports.'" SCA, ECF No. 131-1 at 9. The TAC repeated that "Under Armour's revenue growth, earnings, and inventory reported in the Company's SEC filings were materially misstated during the Class Period, from 3Q15 through 3Q16." JA322. The SEC concluded that investors were misled by Under Armour from the third quarter of 2015 through the fourth quarter of 2016 when it "reported its financial results for the Relevant Period in earnings calls and in reports filed with the Commission." JA1103.

The Delaware Supreme Court recently considered a case with facts analogous to those here. In *In re Alexion Pharmaceuticals, Inc. Insurance Appeals*, Case Nos. 154, 2024 and 157, 2024, 2025 WL 383805 (Del. Feb. 4, 2025), an insured argued that an SEC investigation and securities class action were not related because they had a different "focus." *Id.* at *7. The SEC investigation allegedly focused on "examples of book-keeping violations under the FCPA in Brazil," whereas the securities class action allegedly focused on the insured's "third-party payments to a patient advocacy group in Brazil [that] unethically

37

funded fraudulent lawsuits." *Id*. The trial court held that "the factual connection between the SEC Subpoena and the Securities Action [was] insufficient to make them related." *Id*. at *5.

On appeal, the Delaware Supreme Court reversed, holding that the SEC investigation and securities class action were related because they "involve the same underlying wrongful act," *i.e.*, the insured's "improper sales tactics worldwide." *Id*. at *7. The court reasoned that "[b]ecause both the SEC investigation and the Securities Class Action involve[d] the same conduct" it did not matter that the actions involved "different parties, asserted different theories of liabilities, or sought different relief." *Id*. Again, the same is true here; the Underlying Matters all arise out of the same conduct, *i.e.*, Under Armour's false and misleading statements about its true financial condition. The same result is therefore warranted.

> **b.    The Underlying Matters arise out of related Wrongful Acts under both paragraphs of the Single Claims Provision because they all arise out of the same scheme to misrepresent Under Armour's financial condition and growth prospects.**

Even if the Underlying Matters did not arise out of the same **Wrongful Acts**, they still would constitute a single **Claim** under both paragraphs of the Single Claims Provision because they indisputably arise out of **Wrongful Acts** that at least share a common factual nexus and are logically and causally related.

Under Armour allegedly made false statements about its financial condition and growth prospects to mislead investors about its ability to continue its 20% growth streak. Likewise, Under Armour allegedly engaged in improper sales and accounting practices to doctor its financial records to mislead investors about its ability to continue the same 20% growth streak. The improper sales and accounting gimmicks were a means of cooking the books to support the false statements; both were integral to the overriding goal of misleading investors about Under Armour's financial position and growth prospects. Any lay person would recognize immediately that those two sets of allegations are "related" under the common understanding of that undefined term, let alone under the broad standard of each of the two paragraphs of the amended Single Claims Provision.

The relevant chronology demonstrates that the Underlying Matters all arose out of the same alleged scheme to mislead investors about Under Armour's financial condition and growth prospects.

The first sign of trouble came in the fall of 2016, when Under Armour received the Sorensen Books and Records Demand and Sorensen Derivative Demand, alleging that Under Armour made "false and misleading statements about the effect of the bankruptcy of one of the Company's wholesale national retailers, the Sports Authority … on the Company's financial outlook" between January and April 2016, which led to an "artificial inflation in Under Armour's stock price[.]"

JA832; JA817.  Specifically, Under Armour allegedly misrepresented that its 20% growth streak would continue in 2016 with a net revenue growth of 25%.  JA833.

These same allegations appeared in the February 2017 Breece Complaint, which alleged: "Under Armour's growth began to slow after slew of department store closures and the bankruptcy of The Sports Authority, despite Under Armour's prior positive assurances and indications that the trend of greater than 20% sales growth would be continue[d]."  JA32.  According to the Breece Complaint, Under Armour made false and misleading statements in numerous 2016 earnings reports and assured investors that it "would continue as a force in the sports retail market."  JA35; *see also* JA30-31; JA33-34.  Under Armour allegedly did so while simultaneously concealing its "decreasing growth margins and over surplus of unsold inventory," and while knowing that its "twenty-six consecutive quarters with greater than 20% revenue growth" were coming to an end.  JA35.  The "truth" allegedly was revealed on January 31, 2017, when Under Armour announced its weaker-than-expected fourth quarter earnings and the unexpected resignation of its CFO.  JA34-35.  When Under Armour received the Luger Derivative Demand later that month, it unsurprisingly contained similar allegations regarding Under Armour's public assurances that "Under Armour would continue as a force in the sports retail market" despite an awareness of the

"decreasing growth margins" and inability to maintain a "20% revenue growth." *See* JA368.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████

████████████████████████████████████████████████████, the

*WSJ* picked up the trail in November 2019, reporting for the first time that the government was "investigating Under Armour Inc.'s accounting practices in a probe examining whether [Under Armour] shifted sales from quarter to quarter to appear healthier" and emphasizing that Under Armour's streak of "26 straight quarters of at least 20% year-over-year revenue growth . . . ended abruptly when Under Armour missed its sales targets in the final quarter of 2016." SCA, ECF No. 106-4.

Two weeks later, the Securities Class Action plaintiffs moved to "incorporate the new evidence exposed by the *WSJ* into a consolidated complaint which [would] set forth the strongest and most inclusive securities fraud case

practicable related to Under Armour's scheme to sustain its growth streak at all costs in the shadow of weakening demand." SCA, ECF No. 131-1 at 10. The lead plaintiffs characterized Under Armour's tactics as a single scheme, stating that "[a]t the heart of the Related Actions is Under Armour's scheme to mask slowing demand between late 2015 and early 2017 and its unsuccessful attempt to conceal that the Company's 20-plus quarter streak of at least 20% net revenue growth had come to an end." *Id.* at 5.

In that context, the District Court readily concluded that the "new" allegations about improper sales and accounting practices were related to the original allegations because they were part of an alleged ongoing scheme to misrepresent Under Armour's financial condition and growth prospects. *See* SCA, ECF No. 139 at 2, 10-14. Indeed, the District Court recognized the close connection between the two sets of allegations, holding that the "new evidence" about improper sales and accountings practices supports "the conclusion that Under Armour and Plank knew that demand for their products was waning, resorted to risky sales tactics to keep the numbers intact, and intentionally misrepresented the level of demand for their products." *Id.* at 13-14.

In the TAC filed in October 2020, plaintiffs fleshed out the allegations in the Breece Complaint with additional evidence of the alleged scheme, including from the *WSJ* reports. According to the TAC, Under Armour made overly optimistic

public statements about its revenue, demand, and growth, while also using "suspect sales practices … to increase quarterly revenue, mask slowing demand for Under Armour products, and extend the 26-quarter streak of 20% sales growth."  JA178.

Around six months later, the SEC similarly concluded that Under Armour made materially misleading statements and omissions regarding its "revenue growth rate and the factors contributing to the revenue growth rate" during the third quarter of 2015 through 2016, including in its 2016 earnings reports on April 21, 2016, July 26, 2016, and October 25, 2016, which were also at issue in the Breece Complaint.  *See* JA1096, JA1099-1100; JA64-65, JA68-69.  According to the SEC, Under Armour repeatedly "highlighted" its streak of 20% revenue growth to investors, but failed to disclose the illicit tactics it used to meet those revenue targets, thereby making materially misleading public statements.  *See* JA1096. Also, like the Breece Complaint, the SEC concluded that the truth about Under Armour's finances was revealed on January 31, 2017, when Under Armour announced that it did not meet analysts' revenue estimates and did not continue its 20% growth streak.  JA1102; JA28.

During this same period, Under Armour received additional derivative demands, several of which resulted in derivative actions, including the Consolidated Derivative Actions.  Like the Securities Class Action, both as originally filed and amended, the Consolidated Derivative Actions alleged that

Under Armour (1) touted its 26-quarter streak of 20% growth and represented that it would continue (*see* JA927; JA841-842, JA869-870; JA28; JA176-177); (2) misrepresented its revenue and growth projections, including in statements on April 21, 2016 and October 25, 2016 (*see, e.g.*, JA977-979; JA873-874, JA880-881; JA29-30, JA33-34; JA257, JA259, JA285); (3) mispresented demand for its products (*see, e.g.,* JA961; JA841-843; JA178); (4) concealed issues related to its revenue growth, profit margins, inventory, and the effects of retailer bankruptcies (*see, e.g.,* JA928-929; JA841-843; JA27; JA181, JA192); and (5) used improper sales and accounting practices to conceal Under Armour's true financial condition and maintain its growth image, including its growth streak  (see e.g., JA928-929; JA179).

In short, the Underlying Matters developed in a fashion typical of securities fraud cases.  The initial Derivative Matters and Breece Complaint alleged that Under Armour and its directors and officers made false and misleading statements as part of a scheme to conceal Under Armour's true financial condition and growth prospects from investors.  Later, as additional information became available, plaintiffs added allegations that Under Armour engaged in improper sales and accounting gimmicks to cook its books, which enabled the misleading statements and helped conceal Under Armour's true financial condition and growth prospects from investors.  Those "new" allegations merely provided evidentiary detail about

44

the exact same scheme described in the initial Derivative Matters and Breece Complaint.

As such, the District Court erred in holding that allegations that Under Armour (1) made false and misleading statements to misrepresent its financial condition and growth prospects and (2) used improper sales and accounting practices to misrepresent its financial condition and growth prospects are not "logically or causally related." The logical and casual relationship between the two sets of allegations is obvious; the improper sales and accounting practices enabled Under Armour to make the allegedly false and misleading statements in the first place.

### 3. The conclusion that the Underlying Matters fall within the Single Claims Provision follows *a fortiori* from a substantial body of case law in this Court and nationwide.

Cases in this Circuit and nationwide applying similar policy language compel the conclusion that the Underlying Matters fall comfortably within both paragraphs of the Single Claims Provision as amended by Endorsement 4. Indeed, many of those cases have held claims to be related that were significantly less closely connected than the Underlying Matters.

For example, in *W. C. & A.N. Miller Development Co.*, 814 F.3d 171 (4th Cir. 2016) (Maryland law), this Court held that a breach of contract lawsuit and a fraudulent conveyance lawsuit filed years later were "logically and causally

45

connected" because they involved the same "alleged scheme involving the same claimant, the same fee commission, the same contract, and the same real estate transaction." *Id.* at 176-77. The district court determined that the relevant focus of the two actions should be on the similarities, "not on any number of differences" between the action. *W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, 2014 WL 5812316, at *7 (D. Md. Nov. 7, 2014). In affirming the lower court's decision, this Court determined that the two lawsuits were linked by "a multitude of common facts," including "a common transaction" and "common circumstances"—namely, the insured's "attempts to secure financing for its land development project in Virginia." *W.C. & A.N. Miller Dev. Co.,* 814 F.3d at 177*; see also Stewart Eng'g, Inc. v. Cont'l Cas. Co.*, 751 F. App'x 392, 395 (4th Cir. 2018) (holding that claims from two bridge collapses were related because they were "logically connected by multiple common facts," including, "crucially, [that] the same design flaw caused the collapse of both bridges").

Likewise, in *Bryan Bros. Inc. v. Cont'l Cas. Co.*, 704 F. Supp. 2d 537 (E.D. Va. 2010), *aff'd* 660 F.3d 827 (4th Cir. 2011), the district court held multiple claims alleging that an account clerk embezzled funds from unrelated clients over an extended period were related because they "involved the *same* scheme to defraud [the insured's] clients" and the clerk "used the same modus operandi in concealing her theft by manipulating [the insured's] records." *Id.* at 543. The

court held "[t]hese common ties lead to the inescapable conclusion" that the embezzlement claims were "logically connected." *Id.* The same is true here, with the "common tie" among all the Underlying Matters being the ongoing scheme to mislead investors by falsely presenting Under Armour's financial condition and growth prospects.

Similarly, in *Continental Casualty Co. v. Jones*, No. 3:09-cv-1004-JFA, 2011 WL 3880963 (D.S.C. Sept. 2, 2011), *amended on other grounds on reconsideration as stated* in 2012 WL 530002 (D.S.C. Feb. 17, 2012), the court held that multiple claims asserted by multiple clients against an insured lawyer/accountant who allegedly stole client funds over an extended period were "logically or causally connected" because "they all arose out of [the insured's] scheme to defraud his clients of money and to cover his tracks." *Id.* at *7.

And in *CAMICO Mutual Insurance Co. v. Jackson CPA Firm*, No. 2:15-cv-1823-PMD, 2016 WL 7403959 (D.S.C. Dec. 22, 2016), the court held four claims asserted by different clients against an accountant with declining health were "logically connected" because they were "all based on the acts and omissions of the same person, whose tragic disease cause[d] those acts and omissions, either in whole or in part." *Id.* at *11. The district court acknowledged the "connections do not share the obviousness of the steal-conceal-repeat schemes in *Bryan Brothers* and *Jones*, nor do they form a factual web as strong as the one in *Miller*," but

47

determined the claims were related nonetheless because "[j]ust as the breakdowns of integrity in *Bryan Brothers*, *Jones*, and *Miller* united all the claims in those cases, [the accountant's] breakdown of faculty unites all the claims here." *Id.*

This conclusion is also supported by a large body of case law outside this Circuit. In *American Southwest Mortgage Corp. v. Continental Casualty Co.*, 84 F.4th 910 (10th Cir. 2023), for example, an accounting firm failed to detect that its audit client was engaged in a fraudulent scheme that rendered lines of credit issued by different lenders to be unsecured. *Id.* at 912. The two unrelated lenders alleged that the firm negligently failed to detect the fraudulent scheme in three separate audits. *Id.* The Tenth Circuit held the audits were "logically connected" because "[e]ach audit report 'flow[ed] from the other' as a result of one common circumstance: the Auditor's negligence." *Id.* at 915 (citing *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 811 (10th Cir. 2009)). The Court reasoned "the common facts and circumstances underlying the recurring negligence here make it 'predictable' that the Auditor may make the same mistake – just as he did." *Id.* *See also Highwoods Props. v. Exec. Risk Indem., Inc.*, 407 F.3d 917, 922 (8th Cir. 2005) (holding two lawsuits were related claims, notwithstanding that they alleged "distinct wrongful acts," focused on different aspects of a merger, and sought different remedies).

In *Morden v. XL Specialty Insurance*, 903 F.3d 1145 (10th Cir. 2018), the Tenth Circuit held a lawsuit brought by an investment advisor's clients (alleging improper investment advice involving four different ventures over a four-year period) and SEC proceedings (alleging violation of federal securities laws in connection with the sale of stock in some of the companies in which the clients invested) involved "Interrelated Wrongful Acts." *Id.* at 1151. Although the relevant investments and ventures were "quite varied in nature[,]" the court determined that they "share[d] common threads." *Id.* at 1147. The Court concluded that the matters involved Interrelated Wrongful Acts because the Wrongful Acts at issue "were committed by the same entity…, against the same victims (the [plaintiffs] and other clients), using the same techniques (understating risk, overstating upside potential, and concealing financial interests of the advisers), during the same time frame (2005-2009)." *Id.* at 1152. Again, the same is true here – Under Armour allegedly engaged in an ongoing scheme to mislead investors by making false statements about its financial condition and growth prospects, supported by improper sales and accounting practices that caused Under Armour's financial statements to be improper.

The Eleventh Circuit adopted a similar analysis in *American Casualty Co. of Reading, Pa. v. Belcher*, 709 F. App'x 606 (11th Cir. 2017). There, multiple patients who received injections of contaminated medicine into their eyes asserted

bodily injury claims against a compounding pharmacy. *Id.* at 608. Although the claims were brought by different patients who received different types of contaminated medication made in different batches on different dates, the court held they were "logically or causally connected" because the medication was prepared in the same place, by the same person, with the same process, with the same violations of health and safety regulations. *Id.* at 609. *See also Kilcher v. Cont'l Cas. Co.*, 747 F.3d 983 (8th Cir. 2014) (holding multiple claims asserted by multiple claimants were related because, "[a]lthough [the insured] made different alleged misstatements, omissions, and promises on different dates to each [claimant], there nonetheless exists a logical connection between her wrongful acts"); *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1263–64 (11th Cir. 2000) (holding that two class actions were related because, though the lawsuits involved "different types of acts," the acts were all "aimed at a single particular goal").

In *First Solar, Inc. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 274 A.3d 1006 (Del. 2022), the insured focused on differences between two actions in an attempt to demonstrate that the actions were not related. *Id.* at 1015. The Delaware Supreme Court rejected the insured's argument, holding that a securities class action and an opt-out action fell within a single claim provision because the lawsuits alleged the same "fraudulent scheme to inflate the price of First Solar's stock by making misrepresentations about its solar power cost and

efficiency." *Id*. at 1017. The court determined the lawsuits were related even though the operative complaints included "different misrepresentations and evidence to support their claims." *Id*. Here, as in First Solar, each iteration of the Securities Class Action, the Government Investigations, and the Derivative Matters all focus on Under Armour's alleged scheme to mislead investors, as evidenced by false public statements and utilization of accounting and sales practices to support the false statements. Any differences among the Underlying Matters are inconsequential and irrelevant to the inquiry mandated by the controlling policy language.

Likewise, in *Uni-Pixel, Inc. v. XL Specialty Insurance Co.*, No. 14-18-00828-CV, 2020 WL 1528098 (Tex. App. Mar. 31, 2020), a Texas appellate court analyzed whether Wells Notices and an SEC enforcement action were Claims arising from the same "Interrelated Wrongful Acts" as a class action, derivative suit, and an SEC investigation. *Id*. at *6. The court held the Claims "stem[med] from the same wrongful acts arising out of the same series of related facts" because both the pleadings and the investigation were premised on alleged false or misleading statements about the market viability of Uni-Pixel's products and failure to institute accounting controls. *Id*. at *6–7.

The District Court never addressed this abundant case law holding that meaningful connections among claims (including that the alleged wrongful acts

51

were part of a broader scheme) mandates treating the claims as related under policy language similar to or the same as that here. Instead, the District Court relied on two easily distinguishable lower court decisions. In *ACE American Insurance Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789 (D. Md. 2008), which was decided long before *W.C. & A.N. Miller* and most of the other decisions discussed above, the court held that two sets of claims, which had little in common beyond that both involved the insured's general "business practices," did not share a "common nexus," noting that holding otherwise would preclude coverage for "*any* claim against [the insured] based on how it provides business services." *Id.* at 800.

The other case on which the District Court relied actually supports the Insurers' position. In *Perdue Farms, Inc. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 517 F. Supp. 3d 458 (D. Md. 2021), the court held that two antitrust actions did not "arise from a common nucleus of facts" because they alleged entirely distinct antitrust violations, emphasizing that the alleged commonalties between the claims were insignificant to the alleged antitrust violations. *Id.* at 463-464. The court distinguished *W.C. & A.N. Miller* and other cases, including on the ground that those cases involved a "common scheme." *Id.* at 466. Here, of course, the Underlying Matters all allege an ongoing scheme to mislead investors about Under Armour's financial condition and growth prospects. As explained above, the District Court itself recognized that the allegations about

52

Under Armour's false statements and accounting gimmicks are related when it granted the Motion for Indicative Ruling. *See supra*, Section I.A.2

In sum, the District Court's decision improperly focused on the various means that Under Armour used to effectuate its alleged scheme, instead of focusing on the alleged scheme itself. Courts routinely recognize a shared scheme, shared cast of characters, and shared misrepresentations as critical factors establishing relatedness. Because the Underlying Matters allege a singular scheme to portray a misleading picture of Under Armour's financial health, they fall comfortably within both paragraphs of the Single Claims Provision as amended by Endorsement 4 and are deemed a single **Claim** first made before the 17-18 Policy Period.

## II. The Specific Matter Exclusion and Prior Notice Exclusion each separately and independently bar coverage.

Two exclusions also independently bar coverage for the Underlying Matters under the 17-18 Policies: (1) the Specific Matter Exclusion and (2) the Prior Notice Exclusion.

First, the Specific Matter Exclusion bars coverage for "that portion of **Loss** on account of any **Claim** resulting from any litigation, claim, proceeding, event, or other matter described below, or any **Wrongful Act** or **Interrelated Wrongful Act** alleged therein." JA484. Solely for purposes of the Specific Matter Exclusion, "**Interrelated Wrongful Acts**" means "the **Wrongful Acts** that have as

a common nexus the fact, circumstance, situation, event, transaction or series of causally connected facts, circumstances, situations, events or transactions." JA484. The matters listed in the Specific Matter Exclusion include the Breece Complaint, the Sorensen Books and Record Demand, the Sorensen Derivative Demand, and the Luger Derivative Demand.

By definition, the TAC in the Securities Class Action "result[s] from" the Breece Complaint, given that the TAC is merely the newest iteration of that complaint. The Specific Matter Exclusion also bars coverage for the Government Investigations and Derivative Matters because they each result from any litigation, claim, proceeding, event, or other matter at issue in the Securities Class Action and those Derivative Matters specifically identified in the Specific Matter Exclusion (Sorensen and Luger), or any **Wrongful Act** or **Interrelated Wrongful Act** alleged therein.

Second, the Prior Notice Exclusion precludes coverage for **Loss** on account of that portion of any **Claim** made against any **Insured** "based upon, arising out of, or attributable to any fact, circumstance, or situation which has been the subject of any written notice given under any directors and officers liability policy of which this Coverage Section is a direct or indirect renewal or replacement and accepted by the insurer of such policy as a notice of circumstances[.]" JA501.

The Securities Class Action, including the TAC, is based upon, arises out of, and thus is attributable to the facts, circumstances and situations that were the subject of the Breece Complaint, noticed under the 16-17 Primary Policy.  The Prior Notice Exclusion also bars coverage for the Government Investigations and the Derivative Matters because they are based upon, arise out of, and are attributable to the facts, circumstances and situations that were also the subject of Under Armour's notices under the 16-17 Primary Policy, including the Breece Complaint, the Sorensen Books and Records Demand, the Sorensen Derivative Demand, and the Luger Derivative Demand.  *See supra* Section I.C.2-3.

## III. The 19-21 Policies' Specific Investigation Exclusion cannot amend the 17-18 Policies.

Under Armour argued below that by including a SIE in the 19-21 Primary Policy issued to Under Armour, the insurers participating on both the 17-18 and 19-21 insurance towers agreed that the Government Investigations "trigger" the 17-18 Policy Period and therefore those insurers are precluded from arguing that the Government Investigations and subsequent related matters trigger any policy other than the 17-18 Primary Policy.  The SIE does no such thing.

An endorsement to a separate contract cannot amend the 17-18 Primary Policy, which states:

> No change in, modification of, or assignment of interest under this
> **Policy** shall be effective except when made by a written endorsement

to *this **Policy*** which is signed by an authorized representative of the Insurer.

JA472 (emphasis added).  The Insurers did not agree to add the SIE to the 17-18 Primary Policy.  Accordingly, the SIE does not operate to change the terms of 17-18 Primary Policy.

The SIE itself recognizes this limitation.  It states that if a Claim is excluded by the SIE and treated as made during the 17-18 Policy Period, that treatment remains "subject to all terms, conditions, limitations and exclusions" of the 17-18 Primary Policy.  JA1467-1468.  Accordingly, the 17-18 Primary Policy's terms – including the Single Claims Provision, the Specific Matter Exclusion, and the Prior Notice Exclusion – remain in force and, as argued above, apply such that the Underlying Matters are deemed a single **Claim** first made before the 17-18 Policy Period.

## CONCLUSION

The District Court's judgment should be reversed.  Under Armour's attempt to tap a second tower of coverage for the Underlying Matters cannot be reconciled with the plain language of the 17-18 Policies.

April 7, 2025

Respectfully submitted,

/s/ *Michael P. O'Day*
Michael P. O'Day
Alexa Pauline Ain
DLA PIPER LLP (US)
650 S. Exeter Street
Suite 1100
Baltimore, MD 21202
(410) 580-3000

*Counsel for Plaintiff-Appellant*
*National Union Fire Insurance*
*Company of Pittsburgh, PA*

/s/ *John R. Solter, Jr.*
John R. Solter, Jr.
AZRAEL, FRANZ, SCHWAB,
LIPOWITZ & SOLTER, LLC
101 East Chesapeake Avenue
Fifth Floor
Baltimore, MD 21286
(410) 821-6800

Darius N. Kandawalla
Jordan W. Ziolkowski
BAILEY CAVALIERI LLC
10 W. Broad Street, Ste. 2100
Columbus, OH 43215
(614) 229-3257

*Counsel for Plaintiff-Appellant*
*Freedom Specialty Insurance Company*

/s/ *Richard A. Simpson*
Richard A. Simpson
Margaret T. Karchmer
Anna J. Schaffner
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

*Counsel for Plaintiff-Appellant*
*Continental Casualty Company*

/s/ *John R. Solter, Jr.*
John R. Solter, Jr.
AZRAEL, FRANZ, SCHWAB,
LIPOWITZ & SOLTER, LLC
101 East Chesapeake Avenue
Fifth Floor
Baltimore, MD 21286
(410) 821-6800

Paul T. Curley
Briana Semenza
KAUFMAN BORGEEST & RYAN
LLP
200 Summit Lake Drive
Valhalla, NY 10595
(914) 449-1019

*Counsel for Plaintiff-Appellant Swiss*
*Re Corporate Solutions America*
*Insurance Corporation*

/s/ *Gabriela Richeimer*
Gabriela Richeimer
WERNER AHARI MANGEL LLP
2112 Pennsylvania Avenue NW
Suite 200
Washington, DC 20037
(202) 599-1092

*Counsel for Plaintiff-Appellant XL Specialty Insurance Company*

/s/ *Leslie S. Ahari*
Leslie S. Ahari
WERNER AHARI MANGEL LLP
2112 Pennsylvania Avenue NW
Suite 200
Washington, DC 20037
(202) 599-1013

*Counsel for Plaintiff-Appellant QBE Insurance Company*

/s/ *Travis Wall*
Travis Wall
Gordon Smith
KENNEDYS CMK LLP
455 Market Street, Suite 1900
San Francisco, CA 94105
(415) 323-4487

*Counsel for Plaintiff-Appellant Allied World National Assurance Company*

/s/ *John J. Murphy, Esq.*
John J. Murphy, Esq.
WALKER, MURPHY & NELSON, LLP
9210 Corporate Boulevard
Suite 320
Rockville, MD 20850
(301) 519-9150

*Counsel for Plaintiff-Appellant Navigators Insurance Company*

/s/ *John J. Murphy, Esq.*
John J. Murphy, Esq.
WALKER, MURPHY & NELSON, LLP
9210 Corporate Boulevard, Suite 320
Rockville, MD 20850
(301) 519-9150

Geoffrey W. Heineman, Esq.
John J. Iacobucci Jr., Esq.
ROPERS MAJESKI PC
800 Third Avenue, 29th Floor
New York, New York 10022
(212) 668-5927

*Counsel for Plaintiff-Appellant Argonaut Insurance Company*

58

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants believe oral argument would be beneficial in this appeal to fully present the issues to the Court and to address any matters of interest or concern to the Court.

# CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains [12,740] words.

   [ ] this brief uses a monospaced type and contains [state the number of]

   lines of text.

2. This brief complies with the typeface and type style requirements because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [Microsoft Word 365] in [14pt Times New Roman]; or

   [ ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

April 7, 2025                                    /s/ *Richard A. Simpson*
                                                 Richard A. Simpson

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2025, I caused a true and correct copy of the Public and Sealed Opening Brief of the Plaintiffs-Appellants to be filed with the clerk of the U.S. Court of Appeals via the appellate CM/ECF system, which will send notice of the filing to all participants in this case including counsel for the Appellee.

I further certify that on April 7, 2025, I caused a copy of the Sealed Opening Brief of the Plaintiffs-Appellants and Sealed Appendix to be served, via email, upon counsel for the Appellee, at the following address:

Jonathan G. Hardin
Michael T. Sharkey
Molly A. Olds
PERKINS COIE LLP
700 13th Street, N.W., Suite 800
Washington, D.C. 20005-3960
(202) 654-6297
JHardin@perkinscoie.com
MSharkey@perkinscoie.com
MOlds@perkinscoie.com
*Attorneys for Under Armour, Inc.*

/s/ *Richard A. Simpson.*
Richard A. Simpson